## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **MARIO CARRENO,** | **Civil Action No. 11-4042 (WJM)** |
| **Plaintiff,** | |
| **v.** | |
| **CITY OF NEWARK, CITY OF NEWARK POLICE DEPARTMENT, PAUL HAMILTON, JOHN DOES 1-20, AND ABC CORP 1-20,** | <u>OPINION</u> |
| **Defendants.** | |

<u>FALK</u>, U.S.M.J.

## I.      <u>INTRODUCTION</u>

This is a motion to disqualify Plaintiff's counsel because of an alleged conflict of interest.

From 2003 until September 2009, Plaintiff's counsel, Diego F. Navas, Esq., was employed by the City of Newark ("the City") as chief in-house counsel for the Litigation Section in the City's Law Department. During his employment, he was responsible for evaluating the merits of tort and civil rights cases filed against the City, personally defending the City and its police officers in countless civil rights cases, and supervising associate attorneys representing the City and its interests.

Now, two years after his departure from the City's employ and engaged in private practice, Navas has filed a civil rights action on behalf of Plaintiff Mario Carreno against the City and Newark Police Officer Paul Hamilton ("Hamilton") (collectively "Defendants"), which arises out of an incident that occurred when Navas was *still employed* by the City. The Complaint alleges that Hamilton used excessive force to arrest Carreno without probable cause, that the City and Hamilton engaged in a conspiracy to deprive Carreno of his constitutional rights, and that the City is liable for the constitutional violations under <u>Monell v. Dep't of Soc. Servs. of the City of New York</u>, 436 U.S. 658 (1978) ("<u>Monell</u>").

The Complaint includes allegations referring to the confidential disciplinary history of Officer Hamilton, who was an individual defendant in a previous case in which Navas was involved as City counsel. In addition, as support for the <u>Monell</u>-type allegations in the Complaint, Navas expressly pleads and relies on a petition filed by the American Civil Liberties Union ("ACLU") with the United States Department of Justice that alleges widespread and systemic civil rights failures within the Newark Police Department. The alleged violations by the Newark Police Department referred to in the ACLU petition occurred, at least in part, when Navas himself was the supervising Section Chief in the City's civil litigation section and was personally responsible for defending the City and its policies.

In light of Navas's previous representation, Defendants have moved to disqualify Navas pursuant to New Jersey Rule of Professional Conduct ("RPC") 1.9(a) and the New Jersey Supreme Court's controlling opinion in <u>City of Atlantic City v. Trupos</u>, 201 N.J. 447 (2010) ("<u>Trupos</u>"). Basically, Defendants claim that Navas has a disqualifying conflict of

2

interest and is engaged in prohibited side-switching.

The motion is fully briefed.  No argument was heard.  For the reasons that follow, the Court concludes that Navas's representation of Plaintiff in this case violates RPC 1.9(a). Accordingly, Defendants' motion to disqualify is **granted**.

## II.   <u>BACKGROUND</u>

### A.   <u>Present Complaint</u>

In July 2009, Plaintiff alleges that he was at his residence in Newark, New Jersey, when members of the Newark Police Department, including Officer Hamilton, entered into his apartment to arrest another individual in connection with a solicitation/prostitution investigation. (Compl., ¶¶ 10-11.)  Plaintiff alleges that he was placed in handcuffs, struck in the side of the head by Hamilton, and pushed to the floor. (Compl., ¶¶ 13, 16.)  Plaintiff further alleges he suffered a large laceration to his scalp caused by Hamilton's use of excessive force. (Compl., ¶ 19.)  Plaintiff was not charged and states that he reported the incident to the Newark Police Department, which resulted in an internal affairs investigation. (Compl., ¶¶ 20-21.)  Plaintiff claims that he cooperated with the Newark Police's internal affairs department, but that the incident was not properly investigated and no disciplinary charges were ever filed against Hamilton. (Compl., ¶¶ 22-24.)

Plaintiff's Complaint was filed in state court and was removed to federal court on July 14, 2011.  The Complaint contains multiple counts, including: (1) federal civil rights violations against Hamilton for use of excessive force and unlawful arrest under 42 U.S.C.

3

§ 1983; (2) a <u>Monell</u>-type claim[1] against the City for allegedly developing and maintaining policies, practices and customs evincing a deliberate indifference to individuals' constitutional rights; (3) conspiracy under 42 U.S.C. §§ 1985-1986; (4) violations of the New Jersey Civil Rights Act, N.J.S.A. 10:6-1, *et seq*.; and (5) various state law torts. Specifically included in the Complaint are the following noteworthy allegations:

> 24.   Upon information and belief, Defendant Hamilton has been involved in several prior incidents of police misconduct, including the illegal use of force, which have never resulted in discipline against this officer and he has been allowed to remain on the Newark police force.

> 25.   As a matter of custom, practice and/or policy, the Newark Police Department has historically allowed misconduct by its police officers upon citizens to go un-punished which has created an atmosphere where officers believe they can operate with impunity.

> 26.   In fact, the City of Newark Police Department was recently the subject of a much publicized petition filed by the ACLU which charged that the agency fails to adequately investigate incidents of police misconduct resulting in very rare instances of police officers being disciplined for their actions. This petition demands federal oversight of the Newark Police Department.

(Compl., ¶¶ 24-26.)

---

[1] A <u>Monell</u> claim is a Section 1983 municipal liability claim. In short, <u>Monell</u> provides that a municipality can be held liable under Section 1983 for a constitutional violation/injury that directly results from a municipal policy, custom, or practice. 436 U.S. 658, 695 (1987).

**B.**   **Navas's Prior Representation & The Alleged Conflict**[2]

Navas was formerly employed as in-house counsel for the City in its Law Department. (Defendants' Statement of Facts ("DSF") ¶ 8; Plaintiff's Response to Defendants' Statement of Facts ("PRSF") ¶ 8.)  He was Section Chief of the Civil Litigation Section for the City of Newark from 2003 until September 2009.  (DSF ¶¶ 9-10; PRSF ¶¶ 9-10.)  The Section Chief reports to the City's chief legal representative, Corporation Counsel.  (Plaintiff's Counter-Statement of Facts ("PSF") ¶ 2.)  In his role as Section Chief, Navas was responsible for overseeing the Litigation Section, which handled tort and civil rights litigation against the City.  (DSF ¶ 11; PRSF ¶ 11.)  Navas's responsibilities included review of all preliminary notices of tort claims pursuant to the New Jersey Tort Claims Act, N.J.S.A. 59:1-1, *et seq.*, which often overlapped with federal civil rights claims.  (DSF ¶ 12; PRSF ¶ 12.)  Navas was also responsible for assigning cases to himself or to assistant attorneys in the litigation section.  (DSF ¶ 13; PSF ¶ 13.)  If Navas assigned an assistant attorney to a case, he always maintained supervisory responsibility over the case and the assigned attorney.  (DSF ¶¶ 13, 17; PRSF ¶¶ 13, 17.)  Navas concedes that he typically reviewed the allegations in

---

[2] Trupos requires that this Court "make a factual reconstruction of the scope of the prior legal representation." Trupos, 201 N.J. at 465 (citing LaSalle Nat'l Bank v. County of Lake, 703 F.2d 762 (7th Cir. 1983)).  Some of the facts are disputed.  However, the facts included in this section are undisputed unless noted otherwise.  A motion to disqualify "should ordinarily be decided on the affidavits and documentary evidence submitted, and an evidentiary hearing should be held only when the court cannot with confidence decide the issue on the basis of the information contained in [the] papers." Trupos, 201 N.J. at 463.  As detailed in this opinion, the undisputed facts are sufficient to reach a definitive conclusion on the motion to disqualify.

5

complaints, police reports, and witness statements, and that he had access to and, at times, reviewed confidential materials, such as internal affairs ("IA") investigations.  (DSF ¶ 15; PRSF ¶ 15.)[3]  Assignments to assistant counsel were sometimes done by memorandum, and Navas often made comments regarding strategy and provided instructions to the handling attorney how to defend the City, and, if appropriate, the individual police officers involved. (DSF ¶ 15; PRSF ¶ 15.)

According to the City's Tasks and Standards applicable to the Section Chief position, Navas was also responsible to:

- Have daily substantive contact with all attorneys assigned to the Litigation Section.
- Be knowledgeable of the status of all matters handled by the Litigation Section including Court appearances and settlement negotiations.
- Be knowledgeable of the status of all matters assigned to individual attorneys in the Litigation Section.
- Provide Management with a monthly status report as to all pending cases.
- [S]eek settlement approval on all matters, from Corporation Counsel, or her designee, in the first instance.
- Provide attorneys with guidance and supervision concerning all aspects of effectively managing and representing the City in their respective matters.

(DSF ¶ 17 (quoting the City's Tasks and Standards Sheet, attached to Certification of Gary S. Lipshutz, Esq. ("Lipshutz Cert.") as Ex. B); PRSF ¶ 17.)  In addition, Navas was obligated

---

[3] Navas contends that he only actually reviewed IA investigations in "the instances where internal affairs complaints were actually filed" and the materials were provided to the Law Department at the inception of the case; Navas's "recollection is that this was rarely the case[.]"  (PRSF ¶ 15.)

to keep Corporation Counsel and First Assistant Corporation Counsel informed of the status of pending litigation.  (DSF ¶ 18; PRSF ¶ 18.)

During the course of his employment as Section Chief, Navas personally represented the City and individual officers in at least 18 civil rights cases in the New Jersey District Court, some of which were case managed by the Undersigned, and many of which involved Monell-type claims and allegations of excessive force and unlawful arrest.[4]  Likewise, Navas represented the City in many state court cases, including an excessive force action captioned Velez v. City of Newark, Docket # ESX-L-7557-07.  (DSF ¶¶ 24, 27-28; PRSF ¶¶ 24, 27-28.)  Defendant Hamilton was named as a defendant in the Velez case, a state court tort and negligence action.  (DSF ¶ 27; PRSF ¶ 27.)  The parties dispute whether Navas personally represented Hamilton in Velez, but Navas concedes that he reviewed the Velez complaint, police reports, and hospital records, and that he assigned the matter to assistant counsel, Avion M. Benjamin, Esq., in the Litigation Section.  (DSF ¶ 29; PRSF ¶ 29.)  In his memo

---

[4] The cases are: Qualls v. City of Newark, No. 01-2860 (WHW); Mitchell v. City of Newark, No. 02-33 (DRD); Hicks v. Prachar, No. 02-322 (DMC); Feliciano v. City of Newark, No. 02-1946 (JLL); Criado v. City of Newark, No. 02-2434 (WHW); Ratliff v. City of Plainfield, et al, No. 02-4474 (WJM); Jones v. City of Newark, No. 03-17 (GEB); Sanchez v. City of Newark, No. 03-2128 (WJM); Hall v. City of Newark, No. 03-4056 (WGB); Barna v. City of Newark, No. 03-5326 (JAP); McGill v. City of Newark, No. 03-6121 (JCL); Booker v. State of New Jersey, No. 04-245 (DRD); Criss v. Cosgrove, No. 04-2244 (PGS); Rackley v. Newark Police, No. 04-3839 (FSH); Johnson v. City of Newark, No. 05-531 (KSH); Davila v. Weber, No. 07-1304 (JAG); Lima v. Newark Police Department, No. 08-426 (FSH); Serrano v. City of Newark, No. 08-996 (PGS).  Five of these cases were case managed by the Undersigned (Qualls, Hicks, Jones, McGill, and Criss).

assigning <u>Velez</u>,[5] Navas critiques the individual police officers' conduct.   He also specifically directed Ms. Benjamin to, initially, file an answer only on behalf of the City and not Hamilton.  (DSF ¶ 29; PRSF ¶ 29.)  He instructed Ms. Benjamin to review Hamilton's disciplinary history to determine "if it creates any problem for us."  (DSF ¶ 29; PRSF ¶ 29.) Navas directed Ms. Benjamin to report to him when she was "in was in a position to fully evaluate this matter."  (<u>See</u> Lipshutz Decl., Ex. F.)  Thereafter, Ms. Benjamin prepared a memo that recommended that the City, in fact, represent the interests of the <u>Velez</u> defendants, including Defendant Hamilton.  (DSF ¶ 31; PRSF ¶ 31.)  This recommendation was accepted, and an answer was filed on behalf of both the City and Hamilton.  (DSF ¶ 32; PRSF ¶ 32.)

## C.     **The ACLU Petition**

In September 2010, the ACLU filed a petition with the United States Department of Justice requesting an investigation into the Newark Police Department.   (DSF ¶ 36; PRSF ¶ 36.)  According to the ACLU, the Newark Police Department has developed a historical and continuing policy and custom of neglect, including a desultory record of IA investigation, review, and discipline, which has allegedly resulted in the serial violation of citizens' constitutional rights.  In the petition, which is public and has been the subject of

---

[5] The memorandum appears to be a confidential, privileged communication and thus will not be referred to in detail herein.  The Court notes that movant has filed a motion to seal all the briefing in this case.  While the motion is overbroad, it may be appropriate to seal certain redacted portions and exhibits.  The Court does not refer to anything that would be sealed in the course of this Opinion.

press coverage, the ACLU identifies 26 "settled" civil rights cases in support of its request for federal oversight of the Newark Police Department.  The overwhelming majority of these cases contained excessive force, unlawful arrest, and similar alleged civil rights violations. (DSF ¶ 37; PRSF ¶ 37.)   The ACLU petition is tantamount to a massive and sweeping <u>Monell</u> claim, alleging that the City's civil rights record is so poor and entrenched as to warrant federal intervention.  Navas specifically relies on the ACLU petition in Plaintiff's Complaint.  (Compl., ¶26.)  This is highly significant because Navas represented the City, and its police officers, in the very cases he now claims support Carreno's allegation that the City has a policy of deliberate indifference to citizens' constitutional rights.[6]

**D.    <u>The Motion to Disqualify</u>**

On September 23, 2011, Defendants filed the present motion to disqualify Navas as Plaintiff's counsel.  They argue that Navas represented both the City and Hamilton previously and that RPC 1.9(a) compels Navas's disqualification.  They also claim that Navas: (1) had consistent and high-level exposure to the confidential processes of the City's Litigation Department, both in terms of litigation and settlement strategy; and (2) had access to and reviewed reams of confidential police personnel and internal affairs files that can be used against the City and Hamilton in this case.  Plaintiff has strenuously opposed the motion.  He claims that Navas did not represent Hamilton and did not have access to confidential information that can be used in this case.

---

[6] Navas was counsel of record in 8 of the 26 cases identified in the ACLU petition; he supervised the attorney of record in 15 additional cases.  (DSF ¶ 39; PRSF ¶ 39.)

### III.    LEGAL STANDARD

Local Civil Rule 103.1(a) establishes that the American Bar Association's Rules of Professional Conduct ("RPC") as revised by the Supreme Court of New Jersey govern the conduct of the members of the bar admitted to this Court.   See United States v. Balter, 91 F.3d 427, 435 (3d Cir. 1996), cert. denied 519 U.S. 1011 (1996); see also Wyeth v. Abbott Labs., 692 F. Supp. 2d 453, 456 (D.N.J. 2010) (stating that when interpreting the RPC Courts "look mainly to New Jersey state courts' opinions and modify them only when federal law requires or permits"). "Resolution of a motion to disqualify requires the court to balance the need to maintain the highest standards of the legal profession against a client's right to freely choose his counsel." Steel v. General Motors Corp., 912 F. Supp. 724, 733 (D.N.J. 1995).

The movant bears the burden of proving that disqualification is justified. Trupos, 201 N.J. at 463; Maldonado v. New Jersey, 225 F.R.D. 120, 136-37 (D.N.J. 2004). Disqualification motions require careful scrutiny of the underlying facts and a "sense of practicality" to avoid unjust results. See Martin v. AtlantiCare, No. 10-6793, 2011 WL 5080255, at *2 (D.N.J. Oct. 25, 2011); Montgomery Acad. v. Kohn, 50 F. Supp. 2d 344, 349 (D.N.J. 1999). Disqualification must generally be based in "fact," Trupos, 201 N.J. at 464, and "surmise alone cannot support an order of disqualification." Id. at 469. However, "nothing in Trupos abandon[s] the principle that facts in an ethics-related case may be determined through reasonable inferences, as well as by means of circumstantial evidence." Twenty First Century Rail Corp. v. New Jersey, 419 N.J. Super. 343, 357 (App. Div. 2011).

Here, Defendants have moved to disqualify Plaintiff's counsel under RPC 1.9(a).

That rule provides:

> (a)      A lawyer who has represented a client in a matter shall not thereafter represent another client in the same or substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client gives informed consent confirmed in writing.

R.P.C. 1.9(a).[7]

Rule 1.9(a) has three requirements: (1) the existence of a past attorney-client relationship; (2) that the current representation involves the same or a matter substantially related to the previous representation; and (3) that the interests of the attorney's current client are materially adverse to the interests of the former client.  See, e.g., H20 v. Arch Pers. Care Prods., No. 10-3089, 2010 WL 4869096, at *5 (D.N.J. Nov. 23, 2010), aff'd, 2011 WL 1078584 (D.N.J. Mar. 21, 2011); Host Marriott Corp. v. Fast Food Operators, Inc., 891 F. Supp. 1002, 1007 (D.N.J. 1995).

New Jersey "strictly construes RPC 1.9," and "if there be any doubt as to the propriety of an attorney's representation of a client, such doubt must be resolved in favor of

---

    [7]  Technically, because Navas was a former municipal government employee, the applicable Rule of Professional Conduct in the first instance would appear to be RPC 1.11, not RPC 1.9.  See N.J. Rule of Professional Conduct 1.11 (RPC governing "Successive Government and Private Employment").  Neither party cites or discusses Rule 1.11.  This is ultimately not important, however, because RPC 1.11 specifically states that it is "subject to Rule 1.9."  RPC 1.11(a).  Thus, if Navas could not continue his representation under RPC 1.9, there is no need to consider RPC 1.11.  See, e.g., City of Atlantic City v. Trupos, 25 N.J. Tax 108, 112 (N.J. Tx. Ct. 2009) ("Since this case can be disposed of by analysis of the cases interpreting RPC 1.9, there is no need to separately analyze the facts under the special strictures of RPC 1.11."), overruled on other grounds by Trupos, 201 N.J. 447 (2010).

disqualification." <u>Twenty-First Century Rail Corp.</u>, 419 N.J. Super. at 358; <u>see also</u> <u>Herbert v. Haytaian</u>, 292 N.J. Super. 426, 438-39 (App. Div. 1996).

## IV.   <u>ANALYSIS</u>

There are two RPC 1.9(a) prongs in dispute.  One, Plaintiff concedes he represented the City of Newark, but contends he did not previously "represent" Officer Hamilton.  Two, Plaintiff contends that the matters are not "substantially related" within the meaning of RPC 1.9 and <u>Trupos</u>.

## A.   <u>Past Attorney-Client Relationship</u>

Navas concedes that he had a previous attorney-client relationship with the City.  However, Navas attempts to dispute that he represented Defendant Hamilton.  The Court concludes that, under the circumstances here, Navas also had an attorney-client relationship with Officer Hamilton within the meaning of RPC 1.9(a).

The term "'represented' is not defined in RPC 1.9, nor is it defined elsewhere in the Model Rules or in the New Jersey RPCs."  <u>Dewey v. R.J. Reynolds Tobacco Co.</u>, 109 N.J. 201, 214 (1988); <u>see also</u> <u>Gruzen Samton, LLP v. William Paterson Univ.</u>, 2009 WL 1766569, at *5 (N.J. App. Div. June 24, 2009).  An attorney-client relationship may be direct or implied, and "an attorney's acceptance of obligations in his professional capacity need not necessarily be articulated, in writing or speech but may, under certain circumstances, be inferred from the conduct of the parties."  <u>Gruzen</u>, 2009 WL 1766569, at *5 (citing <u>In re Silvermann</u>, 113 N.J. 193, 217 (1988)).  Indeed, the RPC "presuppose a larger legal context shaping the lawyer's role."  <u>Dewey</u>, 109 N.J. at 250.

Navas was the City's chief civil litigator. He was responsible for all civil rights litigation, which often involved whether the Law Department would provide representation for the individual defendant police officers. Navas also determined which lawyers would work on which cases and how they should be handled. In the case of Defendant Hamilton, Navas reviewed the Velez matter, which contained excessive force allegations against Hamilton. (Navas Decl., ¶¶ 18-19.) He prepared a memorandum to assistant counsel evaluating the case against Hamilton, directed that counsel obtain Hamilton's confidential internal affairs file, and indicated some concern about providing representation to Hamilton. (DSF ¶ 29; PRSF ¶ 29; see also Navas Decl., ¶¶ 18-19.) He also directed assistant counsel to discuss the issues with him. (Lipshutz Decl., Ex. F.) In short, Navas evaluated the issues presented in the Velez case and assigned associate counsel, Ms. Benjamin, who operated under Navas's direct control and supervision.[8]

Navas's counter argument appears to be although he represented the City as Chief of Litigation of the Law Department, he did not represent Hamilton because he assigned an associate to defend Hamilton in Velez. In fact, as set forth above, Navas did much more with regard to Defendant Hamilton. However, the argument misses the point for several reasons.

A municipality's lawyers are usually considered a single office and legal unit. See,

_____

[8] It is noteworthy the Tasks and Standards applicable to Navas's position as Section Chief would have required that he have "daily substantive contact" with Ms. Benjamin; that he be "knowledgeable of the status of" the Velez case, including "settlement negotiations"; that he "provide management with a monthly status report as to all pending cases"; and that he provide Ms. Benjamin "with guidance and supervision concerning all aspects of effectively managing" the Velez action. (See DSF ¶¶ 17-18; PRSF ¶¶ 17-18; Lipshutz Cert., Ex. B.)

13

e.g., Perillo v. Adv. Comm. on Prof. Ethics, 83 N.J. 366, 371 (1992) (noting that, "all municipal employees, including counsel, are . . . on the same team."). This is in many ways analogous to individual lawyers in private law firms. Counsel of record for Defendant Hamilton in Velez was the Law Department of Newark. This is similar to private clients and law firms, where the firm is counsel of record, not just the individual lawyers who may work on the case. In some cases, conflicts and representation are imputed to any firm with which the disqualified lawyer is associated pursuant to RPC 1.10. Pursuant to this analysis, conflicts are or would be assessed based on the Law Department's representation (essentially, Navas's law firm).

However, there are exceptions and cases often focus on the individual attorneys involvement in the case. See, e.g., Dewey, 109 N.J. at 214-15. In the case of Officer Hamilton, Navas apparently participated in the decision that the Law Department would defend Hamilton, and that defense was provided under his direction and control. Under either theory, the Court is satisfied that Navas had a past attorney-client relationship with Hamilton to come within the scope of RPC 1.9(a).

The Velez memorandum demonstrates that Navas assessed the case against Hamilton, made specific strategy recommendations how to proceed, discussed affirmative defenses and discovery demands, and commented on the officers' conduct. He also had access to Hamilton's confidential employment and internal affairs files, even though he states that he has no "recollection" of having reviewed the information. Obviously, none of these activities would have happened at all had Navas *not* represented Hamilton. As a matter of

14

"practicality," whether express or implied in nature, the Court has no doubt that Navas represented Hamilton within the meaning and contemplation of RPC 1.9(a).

A contrary conclusion would make no sense.  For example, if Navas was not considered Hamilton's counsel, it could be argued that any communications that he had with Ms. Benjamin, communications that he expressly directed occur, could result in a waiver of the attorney-client privilege.  Likewise, it would have been impossible for Navas to fulfill his responsibilities as Section Chief if he were not considered Hamilton's counsel; e.g., remaining apprised of the status of the case; reporting to Corporation Counsel and Assistant Corporation Counsel settlement positions and negotiations; preparing monthly status reports on the case, the claims, etc.  In short, Navas could not do his job as Section Chief without representing Hamilton.  This detailed analysis conclusively demonstrates that Navas represented Defendant Hamilton and was privy to confidential records that could be used against Hamilton in this case.  As explained below, this alone is sufficient to disqualify Navas.[9]

## B.   The Cases are Substantially Related

In Trupos, the New Jersey Supreme Court held:

> For purposes of RPC 1.9, matters are deemed to be 'substantially related' if

---

[9] Even if the Court concluded that Navas did not formally represent Hamilton, he would still be disqualified under the facts of this case.  Specifically, Navas's undisputed representation of Newark, his access to confidential information that could be used against Hamilton, and the alleged conspiracy pleaded in the complaint, would warrant disqualification under the "sense of practicality" analysis required here.  See, e.g., Martin 2011 WL 5080255, at *2.

> (1) the lawyer for whom disqualification is sought received confidential information from the former client that can be used against that client in the subsequent representation of parties adverse to the former client or (2) facts relevant to the prior representation are both relevant and material to the subsequent representation.

Id. at 467.

The substantial relationship test is met if a lawyer "received confidential information" in a past representation that "can be used" against his former client in the present case. See, e.g., H20, 2010 WL 4869096, at *6. Post-Trupos case law suggests that the following "practical" three step process be used to determine whether a substantial relationship is present:

> *First*, the trial judge must make a factual reconstruction of the scope of the prior legal representation. *Second*, it must be determined whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client in those matters. *Third*, it must be determined whether that information is relevant to the issues raised in the litigation pending against the former client.

Twenty-First Century Rail Corp., 419 N.J. Super. at 357 (emphases added) (citing LaSalle Nat'l Bank v. County of Lake, 703 F.2d 252, 255 (7th Cir. 1983)); see also Trupos, 201 N.J. at 466.

Trupos requires that disqualification of counsel be based in "fact,"and that "surmise alone cannot support an order of disqualification." Id. at 464, 470. However, it is important to note that "nothing in Trupos abandon[s] the principle that facts in an ethics related case may be determined through reasonable inferences, as well as by means of

16

circumstantial evidence." <u>Twenty-First Century Rail Corp.</u>, 419 N.J. Super. at 357.

### 1. <u>Navas Received Confidential Information</u>[10]

The <u>Trupos</u> test merely requires that the Court determine whether "it is reasonable to infer that the confidential information allegedly given [in the prior representation] would have been given to a lawyer representing a client . . . ." <u>Twenty-First Century Rail</u>, 419 N.J. Super. at 360 (citing <u>LaSalle Nat'l Bank</u>, 703 F.2d at 255-56). The Court concludes that not only is it "reasonable to infer" that Navas received confidential information during his prior representations, but that it has been shown that he did, in actual fact, receive confidential information.

The basic contours of what constitutes 'confidential information from [a] former client" are found in Rule of Professional Conduct 1.6. <u>Twenty-First Century Rail</u>, 419 N.J. Super. at 359. According to the New Jersey Supreme Court, Rule 1.6

> expands the scope of protected information *to include all information relating to the representation*, regardless of the source or whether the client has requested it be kept confidential or whether disclosure of the information would be embarrassing or detrimental to the client.

<u>In re Advisory Opinion No. 544 of New Jersey Supreme Court Adv. Comm. On Prof'l Ethics</u>, 103 N.J. 399, 406 (1986) (emphasis added); <u>see also</u> <u>Twenty-First Century Rail Corp.</u>, 419 N.J. Super. at 359. Moreover, client information communicated from a client to an attorney is "confidential" within the meaning of Rule 1.9(a) even "if otherwise disseminated

---

[10] The Court skips to the question of whether Navas received confidential information, as a factual reconstruction of the prior representation has already been accomplished in Part II, *supra*.

or already in the public domain." Twenty-First Century Rail Corp, 419 N.J. Super. at 359

(citing Kevin H. Michels, *New Jersey Attorney Ethics* § 15:2-2(a) at 305-06 (2010)).

The Court finds that Navas received confidential information in at least three forms: (1) access to the City's confidential litigation strategies and processes; (2) access to the City's settlement processes and procedures; and (3) receipt and review of internal affairs investigations and files. Each is addressed separately below.

a.     *Litigation Strategies and Processes.*  Navas was a decision-maker for the City of Newark with respect to civil rights litigation.  One of the primary functions of Navas's prior representation of the City was to receive and review information and strategize about how to represent the City's interests.  This representation by its very nature provided Navas with access to confidential information that would not be available to other attorneys.  For example, he would have information on how the City handled a claim or complaint upon receipt; how the City would investigate its officers; and how the course of investigation would proceed.  His defense of Monell claims would necessitate access to historical confidential information about the City's policies and practices and the police department's internal affairs records.  He would, by necessity, be privy to the City's internal and privileged evaluations regarding its susceptibility to civil rights claims.  No amount of discovery could even the playing field and place another attorney on the same footing as Navas; he has a special advantage and understanding of the City's confidential processes by virtue of his supervisory in-house role.

All information learned from a client during a representation is confidential.  See, e.g.,

18

Twenty-First Century Rail, 419 N.J. Super. at 359.  The types of information Navas received in defending past Monell claims is likely privileged.  There is no doubt that it is confidential within the meaning of RPC 1.6 and 1.9(a).[11]

       *b. Settlement Processes.*  Navas also had access to the City's confidential processes used to settle litigation.  Defendants' counsel submits certain memoranda prepared by Navas during his employment relating to the settlement of individual claims.  (See Supplemental Declaration of Gary Lipshutz, Esq., Exs. C-E.)  In some of these memoranda, Navas specifically discusses settlement of claims against the City; in others, he rejects settlement offers, adds and subtracts conditions to settlement, and recommends to Corporation Counsel whether claims should or could settle.  (See id.)  Navas had deep

---

[11] While neither party cites any case law on the issue, the most factually analogous case that this Court located is Green v. City of New York, No. 10-8214, 2011 WL 2419864 (S.D.N.Y.  June 7, 2011).  In that case, the plaintiff's two attorneys had previously been employed as assistant corporation counsel in the New York City Law Department. Id. at *1.  In counsels' prior role with the City of New York, they represented the City and certain city employees in connection with a lawsuit challenging  the lawfulness of strip searches conducted of pretrial detainees. Id.  After leaving the City's employ, the former assistants switched sides and filed a complaint against the City pursuant to Section 1983, challenging the strip search policy and bringing "a Monell-type claim against the City of New York." Id.  In pleading the complaint, counsel specifically relied on the prior litigation to support the Monell claim (similar to Navas's reliance on the ACLU petition in this case).  Id.  On a motion to disqualify filed by the City, the Court concluded that "there is a substantial risk that confidential information was obtained," id. at *1, in the prior representation, and that in their prior representation counsel were exposed to confidential governmental processes and information, such as "training materials and policy statements." Id. at *2.  Based on these concerns, counsel were disqualified. Id. at *3.

      While the disqualification in Green was made under NY RPC 1.11 and not 1.9, and the Green court was not applying the Trupos standard, the case is illustrative of the types of problems inherent in representing a municipality and then subsequently switching sides and bringing a Monell-type claim attacking the very same policies.

19

exposure to the City's settlement processes, and directly participated in the settlement of numerous claims. He was aware of how the City values cases, and what would make the City more or less likely to settle.

Navas takes issue with Defendants' characterization of the settlement process, claiming that others in the City's Administration really controlled the process.[12] But, that actually proves Defendants' point. No member of the public or regular attorney would be aware of the specific internal process the City used to evaluate the settlement of claims. This is confidential information within the meaning of the RPCs and Trupos.[13]

     *c. Internal Affairs Files.* The record shows that Navas clearly received specific confidential documents during his previous representation in the form of IA files.

Navas admits that he had access to confidential IA documents during his employment,

---

[12] Navas claims that in 2006, his duties with respect to settlement decisions were reduced "and generally limited to making written recommendations to the Corporation Counsel or First Assistant Corporation Counsel." (Declaration of Diego F. Navas, Esq. ("Navas Decl.") ¶ 6.) He claims "those two officials" made settlement decisions, which were then relayed to him. (Id.)

[13] To the extent Plaintiff suggests that the "confidential information" at issue has to be a specific document or communication and that general exposure to certain processes are insufficient, the Court disagrees that Trupos is meant to be read so rigidly. In Trupos, the Court rejected the *possibility* that counsel "may" have been privy to plaintiff's settlement determinations or methodology as a basis for disqualification. Id. at 469. Trupos specifically stated that "there is no proof of any settlement tactics being shared with the law firm," and refused to base disqualification on surmise that there may have been. Id. However, Trupos did *not* suggest that exposure to such processes, if proven, could not support an order of disqualification. Id. at 470. Here, there is *record proof* that Navas both had access to and participated in certain settlement discussions. He was also privy to and, in his own papers, admits that he knows, from his prior representation, the process by which cases in Newark are settled, information which is not otherwise publicly known. Thus, unlike Trupos, Navas's exposure to settlement processes is relevant to the issue of disqualification.

although he contends he utilized them "rarely," and that they are not truly "confidential" because they could be obtained in discovery. Contrary to Plaintiff's argument, the New Jersey Attorney General's Internal Affairs Policies & Procedures specifically state that "the nature and source of internal investigations, the progress of internal affairs investigations, and the resulting materials are *confidential information*."[14] While internal affairs files may be sought in discovery, there is no certainty that they will be produced. And, regardless, that does not make them any less "confidential." In fact, parties routinely fight over the production of internal affairs files, and in cases where they are produced, they are almost always provided under the protection of a discovery confidentiality order.

As this Court has previously explained, it does not make sense to apply a discovery disclosure based standard to determine "confidentiality" in the context of a Rule 1.9(a) disqualification:

> [A] discovery disclosure based standard governing disqualification is illogical and impractical. A simple example demonstrates the difficulties with such a standard. Say a lawyer adverse to a former client files a motion and prevails and the suit never reaches discovery. In theory, a lawyer could have confidential information from a client and use it to craft a motion to dismiss a subsequent complaint. If that motion were to be granted, the lawyer, operating under a conflict, would have successfully avoided disqualification only because the lawyer was particularly adept at using confidential information to his/her benefit before discovery ever commenced. . . . [T]ying disqualification to future discovery is simply unworkable. It also does not comport with the policies that RPC 1.9 is premised upon.

---

[14] The New Jersey Attorney General Internal Affairs Policies & Procedures are available at http://www.nj.gov/oag/dcj/agguide/internalaffairs2000v1_2.pdf. The specific provision quoted is located at page 11-46.

> There are many other problems. As one court has described, having access to otherwise confidential information from a previous representation could provide advantages such as 'knowing what to ask for in discovery, which witnesses to seek to depose, what questions to ask them, what lines of attack to abandon and what lines to pursue, what settlements to accept and what offers to reject, and        innumerable other uses.' Webb [v. E.I. DuPont de Nemours & Co., Inc., 811 F. Supp. 158, 162 (D. Del. 1992) ("It is immaterial that those documents would be available to any attorney in discovery.  Rule 1.9(a) is not addressed to the documents but to the representation in general.")].  It is unfair to afford one side such an advantage.

H20, 2010 WL 4869096, at *12.[15]

In sum, it is beyond dispute that Navas received bountiful confidential information in the course of his prior representations.[16]

---

[15] Navas also appears to also contend that IA files are not confidential because of the ACLU petition; however, the petition would imply otherwise.  In fact, the petition itself refers to reliance on "police-generated statistics about IA complaints," and indicates that "*because of the secrecy afforded to internal affairs complaints by the NPD,* [the ACLU] does not know the names of . . . complaintants."  (ACLU petition, attached as Exhibit K to the Lipshutz Cert., at 9 n.4 (emphasis added).)

[16] There is something of a dispute over whether Navas actually reviewed Hamilton's individual IA file.  There is no dispute that he had access to it.  Defendants contend that Navas had to have reviewed the file because of the express allegation in the Complaint regarding Hamilton's "several prior incidents of police misconduct, including the illegal use of force, which have never resulted in discipline against this officer . . . ."  (Compl., ¶ 24.)  Navas contends that his "recollection" is that he did not review Hamilton's IA file and that the allegations in the Complaint were made "based on information which is generally known, such as the ACLU's petition."  (Pl.'s Br. 25.)  The Court believes the specificity in the Complaint exceeds the information that was generally known to the public.  But that is beside the point.  It is clear that Navas's associate to whom he assigned the Velez case did, in fact, review Hamilton's information and recommend that an answer be filed on his behalf.  She did this at Navas's direction and in consultation with him.  By virtue of his supervisory role and his specific actions in the Velez matter, it is reasonable to "infer," by "circumstantial

2.      **The Confidential Information Can Be Used Against Defendants**

The abundant confidential information Navas received in the prior representations can certainly be used in this case.

A Monell-type claim seeks to impose municipal liability for a constitutional injury causally connected to a municipal policy, custom, or practice.  The types of information lawyers may attempt to use to prove such claims mirrors the type of confidential information and processes that Navas had access to.  For example, in order to prove a "custom," a plaintiff may show a pattern of misconduct through prior incidents;[17] may introduce evidence of supervisory knowledge of prior unlawful conduct;[18] could show that improper conduct was tolerated or ignored and that remedial action was avoided;[19] could rely on evidence showing a failure to investigate complaints or discipline employees;[20] and could show that there was a failure to keep and maintain proper records and have proper procedures in place for the investigation of complaints.[21]  This is precisely the type of

---

evidence," that not only did Navas have access to confidential information but that he had actual exposure to information relating to Defendant Hamilton, either directly or through communications with Ms. Benjamin regarding the Velez case.

[17] Beck v. City of Pittsburgh, 89 F.3d 966, 973-76 (3d Cir. 1996).

[18] Stoneking v. Bradford Area School District, 882 F.2d 720, 727-28 (3d Cir. 1989)

[19] Beers-Capitol v. Whetzel, 256 F.3d 120 (3d Cir. 2001)

[20] Bielevicz v. Dubinon, 915 F.2d 845, 850-53 (3d Cir. 1990).

[21] Black v. Stephens, 662 F.2d 181, 195-96 (3d Cir. 1981).

information that Navas had access to, and necessarily would have considered, in defending

countless <u>Monell</u> claims against the City.

Navas also could use intimate knowledge of settlement procedures and protocols

against Defendants.  How the City made decisions about settling civil rights cases is highly

valuable confidential information that is not known to non-City attorneys.  It is conceivable

that Navas could use this knowledge to benefit his current client, which would be an unfair

advantage.

Moreover, it appears that Navas already *has* used some confidential information

against Defendants.  In the Complaint, Navas specifically pleads  "[u]pon information and

belief, Defendant Hamilton has been involved in several prior incidents of police misconduct,

including the illegal use of force, which have never resulted in discipline against this officer

and he has been allowed to remain on the Newark police force."  (Compl., ¶ 24.)  In the

<u>Velez</u> case, at a minimum, Navas prepared a memo expressing concern about the disciplinary

histories of certain police officers.  That is all that is really needed.  Even if not deliberate,

it is reasonable to infer that Navas has used confidential information from the <u>Velez</u> case in

preparing the Complaint in this case.

**C.     The *Monell* Claim and Reliance on the ACLU Petition Constitute a
        "Substantial Relationship" *Per Se***

RPC 1.9(a) prohibits representation adverse to a former client in a "substantially

related" matter.  Since the scope of a substantially related matter is often complex, <u>Trupos</u>

definitively defined its parameters.  The Court has followed the <u>Trupos</u> analysis as set forth

above.  However, the Court believes that aspects of this case are so clearly related on their

face to Navas's prior representation of Defendants that no <u>Trupos</u> analysis is even necessary. In other words, when it comes to <u>Monell</u>, the cases are essentially the same.  Specifically, Navas's defense of the City and officers in multiple excessive force and <u>Monell</u> claims raises the identical issue, e.g., <u>Monell</u>, that is raised by Plaintiff against Navas's former clients.  The facts/proof will be the same.

When representing Defendants, Navas was inescapably privy to extensive statistical and factual information regarding excessive force claims, which could establish a <u>Monell</u> claim against the City.  This point is driven home by Plaintiff's reliance on the ACLU petition.  If the petition is accurate, it would establish the paradigm <u>Monell</u> claim.  Moreover, the incident that comprises Plaintiff's present complaint *occurred while Navas was still employed by the City* and still defending the policies now at issue.  Indeed, Navas defended the City in the specific cases cited in the ACLU petition.  But now, Navas is suing the City taking the opposite position.  This patent positional conflict illustrates that the <u>Monell</u> issues are identical in both cases.  This proves beyond doubt that Navas's prior representation is substantially related to the present case, both as a matter of practicality and fairness.

**D.**     **The Conflict Has Not Been Waived**

Navas claims that even if his representation violates RPC 1.9(a), Defendants have waived the conflict because they delayed in seeking his disqualification.  This argument is baseless.  Defendants filed their answer on August 17, 2011.  On August 31, 2011, an initial scheduling conference was held before the Undersigned.  It was at this conference that Defendants raised the issue of disqualification, and the motion was filed less than one month

25

later.  It is true that a conflict can be waived.  <u>See, e.g.</u>, <u>Alexander v. Primerica Holdings, Inc.</u>, 822 F. Supp. 1099, 1114 (D.N.J. 1993) (articulating factors to consider in appropriate circumstances).  However, when a case is in its early stages, discovery has not commenced, and no motions have been filed apart from a disqualification motion, the conflict has not been waived.  <u>See, e.g.</u>, <u>Twenty-First Century Rail Corp.</u>, 419 N.J. Super. at 364-65.

## CONCLUSION

For the reasons set forth above, Defendants' motion to disqualify is **GRANTED**. Plaintiff shall have substitute counsel enter an appearance, or shall enter an appearance *pro se*, on or before January 2, 2012.  An appropriate order will be entered.

s/Mark Falk
**MARK FALK**
**United States Magistrate Judge**

**Dated: November 29, 2011**

26